Good morning, excuse me. May it please the court, my name is Joe Regan, R-E-G-A-N. I'm from Rochester and I represent Kim Greenberg. This is a products liability case involving issues of product defect as well as product warning. Very briefly, Mr. Greenberg was working at the Xerox Corporation up in Rochester and was with the crew that was attempting to change out something called a cloth filter in this very large Larox pressure filter machine. It's a device that would probably fill about a quarter of this room. It's about 25 feet high, 25 feet long, 10 feet wide. As he was performing that act and following the instructions set forth in the Larox manual for this very process, he was operating a hand crank that was intended to reel up this filter cloth. And the cloth, fairly early on in the process, the cloth suddenly reversed itself, reversing the handle and throwing him into a screen close to the machine, and he was seriously injured. The defect that we've described is a propensity on the part of this cloth that's coming out of the machine to pinch on itself. In essence, you have a stream of cloth going in two different directions at the same time. It's going up and over a power roller, a very strong hydraulically operated motor, and then the cloth coming down. And at times, depending on whether the slack is not fully taken out, that cloth will back up and get caught and has enough power to actually damage and destroy parts of the machine. That defect was known by Larox. And, in fact, when they set up this cloth recovery system, including this crank that the plaintiff was operating, they put in a seven-word statement which they say constitutes a warning. It's not in larger print, but it is in bolder print than the accompanying print in the manual. Old cloth must keep tight when reeling. Seven words. That's the warning. Even if we accept that there was a design defect, did the plaintiff offer an alternative, safer design? With respect to the crank, which was part of the setup as set out in the Larox manual, that's one of the keys. It was still a Xerox design, right? Pardon me. It's not a Xerox design. Xerox custom built it, although using as a sketch what was in the Larox manual, wasn't it? Well, Larox said that we can make one for you if you want, and what they make is exactly what they had, or you can go ahead and make it yourself. But this is a perfectly adequate device to use to crank up this material. Xerox had no interest in making this sort of thing. Xerox is not in that business. What they wanted to do was recapture these filters for use at various times when they were changing out the colors of the toner that they were using it to make. Does the record show whether Larox advised any of its other customers in the making of this kind of attachment device, or was this specific to Xerox? Well, it clearly was not specific just to Xerox because Larox admitted at deposition that they make these cranks, and if a customer wants one, they will definitely do it. There was no other method in the Xerox manual for changing out this cloth other than the one that was being followed by my client in the Xerox manual. No other description of, oh, by the way, if you want to, you can just let this accumulate on the floor. There was testimony from the Larox representative that some of their other customers do that, but there was no testimony from any Xerox representative that they were ever told that that is an option to be used in clearing out this filter cloth. So why isn't this case like the Goodyear case, where Goodyear knew there was a defective tire rim assembly that some people were using with its tires? It knew it, but there were other customers that were using a different assembly that was fine, and the court of appeals held, you know, the fact that it knows some people are using a bad rim does not create a duty to warn. The answer is there was nothing wrong with the Goodyear tire. There was everything wrong with the Larox machine inside, internal to the Larox machine itself. But your experts report only criticized the attachments, not the Larox machine. Not so. The experts said the Larox cloth recovery setup, which was a joint operation, happening to utilize this crank, but Larox said this is what you use if you're going to recapture this material. We're going to do this a different way. We're going to hire 20 extra employees to do this by hand, and we're going to run them in shifts, and everyone is just going to stand there pulling out the cloth and feeding in new cloth. Then this wouldn't have happened, right? Well, of course. They could have cut it with a machete. They could have set fire to it. There are a thousand ways you can get that cloth out of there, but why would you not follow the instructions of the manufacturer? And the manufacturer says, by the way, utilize a crank device. And Larox representatives were present at the time this machine was set up. You don't buy this off the shelf. They were there for weeks and months setting this thing up and making sure on the shakedown that everything was operating properly. The testimony was that Larox people were there watching this crank being used as the filter was being changed out. But my understanding is that even if we were to find that your design defect argument was inadequate in that the expert failed to offer adequate alternatives, that you would still urge us to find that Larox was responsible in that it failed to warn of the latent aspect of the machine's operation that created this danger and that your case is substantiated by New York City asbestos litigation. That's correct. Could you get to that, please? Yeah. I believe that is not necessarily just a tweak, but a significant modification of the holding in Mustelli. In the most recent Court of Appeals case, a crane company which designs high-pressure valves for steam applications argued that the fact that certain people developed mesothelioma from the asbestos-related gaskets. But with that said, everybody had to use it with asbestos, right? The crane piece, the crane-manufactured piece, had to be used with asbestos, every customer. Did every customer of the Larox machine have to use it with the device that Xerox used it with? Every customer named Xerox had to because that's what they told them. Okay, but that's a lot different than New York City asbestos, right? But Larox was aware of the problem. Strongest fact. I agree with you. But it's different to have a duty to warn that relates to one specific customer than the New York City asbestos case where they knew that every customer had that same problem. And I don't see that in your record. Every customer with a Larox machine has this inherent defect in it because the cloth will tend to catch on itself. That's developed by Larox. Now, there might be some people that decide that they're going to pull it out. But isn't it significant potentially that Larox offered this design, which Xerox followed, as the way to take the cloth out and to circulate it and didn't disclose that there was this latency problem of the slack developing inside the machine? I agree with that 100%, Judge. Is there any record evidence suggesting that other customers than Xerox followed the manual and used this or built what had been sketched by Larox? The only evidence is that the Larox representative admitted that they sold, because they made them, these very racks to other people. They were freewheeling racks exactly of the type that were used by Xerox. How many, I don't know. But obviously they had it. Built according to that design that Xerox used and that resulted in this? Right. They sold it to other customers. Xerox happens to have enough capacity and facility to be able to make it themselves, but other customers apparently didn't, and that's why Larox offered that service. This wasn't a one-off. The one they offered was similar? The one they offered was similar? Exactly, as described by the representative of Larox. And he said when looking at the application, he said that's a very fine way to do it. He had no objection to the manner in which it was being used. Thank you. You saved some time for rebuttal. Thank you, Judge. Good morning. May it please the Court. I'm John Friedenberg, and I represent Larox, the defendant appellee. Very briefly on the issue of design, I think the failure, the shortcoming in the plaintiff's expert report was borne out in the questions by the Court in Appellant's argument. Professor Quinnell, the expert, made no findings about the Larox machine. I think what we're talking about, though, hasn't Larox effectively adopted the extension onto the machine, the cloth feeding and extraction device, by being so heavily involved in recommending and developing what should be used with its machine? That's a great question, Your Honor. If you look at the pages of the manual that address that, there is something akin to a stick figure of the external rack. There are no specifications of the rack. I think it's important to keep in mind that the feature of the Xerox rack that is alleged to have caused the injury to the plaintiff was the robustness of the hand crank and its ability to move in a reverse direction when the cloth, given certain characteristics of the movement of the cloth, caused it to move in reverse. It's very important to keep that in mind because let's... Is it true that a Larox representative attended the Xerox training, showed Xerox employees how to use the Xerox crank? That's not exactly right, Your Honor. What happened is there were Xerox, I'm sorry, there were Larox representatives at Xerox who were there to ensure that the entire machine, keep in mind that this machine goes about making its toner. That's its business. It runs 99% of the time making toner. The swap-out of the cloth is just one part of the process. It's true that the record shows that there was a Larox representative on site during a swap-out, but they didn't do the kind of analysis of all of the qualities of the Xerox rack. I'd like to draw an analogy. The manual shows this external rack, and then there's a Larox person there during the training while they're teaching employees how to use the rack. Why couldn't a jury find that Larox was involved with the external rack as well? It's not a jury question. The existence of a duty is a question of law. If I may illustrate the kind of duty that the court would be imposing by even entertaining this, we provided, Larox provided, this very substantial machine. We also provided the opportunity to supply this customer, Xerox, not an unsophisticated customer, by the way, with an external rack. Had we done that, we would have owned the responsibility for the external rack. Instead, Xerox says, We've got this. We'll design and make our own. But you have given no reason for Xerox not to build it itself. You provide the sketch. You have your people there. You acknowledge that there is cloth piling up inside the machine, and all you do is say that you have to be careful not to let slack develop. The cloth is not piling up inside the machine, Your Honor. When we talk about cloth piling up, that's the alternative. They may allow it to pile up on the floor if they don't want to reuse it in the way that Xerox reuses it. But imagine the burden that would be placed, the impractical burden that would be placed on Larox if we were to buy the responsibility for all of the features. Sure, this accident happened because of the robustness of the hand crank that was supplied by the employer, Xerox. What about other problems? Was it incumbent on us to ask them, Now, wait a minute. We might have a duty imposed on us down the road, so you better give us four or five prototypes of this so we can take it. You clearly recognized there was some duty, didn't you, because you provided a kind of all-caps, you know, don't let slack develop. So there was some reason. If you look at the testimony of Janne Kaipanen, the Finnish gentleman who was our witness, he described a danger to the machine itself, the Larox machine may suffer damage in the event that there is a failure to keep the tautness during the removal. There was no recognition by Mr. Kaipanen or anybody else that there was ever an injury by somebody electing to hold on to a less than robust crank that happens to reverse itself during this operation. But imagine if we had to take this responsibility. Let's say we had to find out whether the geometry of the Xerox rack was such that when cloth accumulated on it, it didn't tip over from imbalance, or that the spindle was robust enough to hold the cloth as it accumulates. Those are the kinds of things that I think the courts recognized when talking about the common sense application here. You can't impose the responsibility on Larox for the specific features that go beyond the sketch drawing. Let me ask you this. The sketch drawings, I take it, were in every manual or just the Xerox manual? It was this manual, Your Honor. Okay. And was there anything in there talking about the robustness of the crank? No. No, there was nothing about the crank at all in the manual. Those were all electives by Xerox. Xerox designed, Stephen Malachowski testified. He sketched it out, and they gave it to their contractor to build, and they gave it to their contractor to build on their own, Xerox's own specifications. This is not like, as Judge Kearney, as you raised, this is not like the asbestos case from June. In the asbestos case, what happened there was cranes, valves, would not operate in the environment to which they were intended without asbestos. Asbestos was both what made it functional and what made it dangerous, and therefore it was required that there be a warning about the asbestos. It was the, if you would, the asbestosness of the asbestos that caused the injury and caused the danger and permitted the function. But similarly here, there is a danger in the cloth change-out procedure that, it seems to me, Xerox did not identify adequately, potentially, according to just providing the sketch. But perhaps, Your Honor, somebody, if we had provided our own external rack, we would have been able to specify how much robustness was required in the crank and provide the crank that would do the job. You could have said to Xerox, we'll give you a sketch, but you've got to give us an identification. Well, we didn't do that here, Your Honor. That simply wasn't part of the deal that was discussed by these. The question is whether you took that risk by not getting that. I really don't think so, Your Honor. I think that's imposing a duty on a manufacturer that runs for our field. If we had made the rack ourselves, we would have bought the responsibility, we would have owned the responsibility. We simply don't have that responsibility here. Xerox said, we've got it, we'll make our own, and thereby Xerox took on the responsibility to Which should Xerox have known about the risks of building it themselves? I gather from what you said before, there was mostly risk to damaging a $1.2 million machine, but not necessarily to an individual for bodily injury. Correct. There is no history, and this was testified to, this was in Mr. Kaipanen's testimony as well, there is no history of anyone ever being injured previously by a crank reversing, a hand crank reversing on one of these external racks. And you asked the question, what should Xerox have known? Well, Xerox has made previous racks for other toner machines. In fact, Mr. Malkowski, the man who testified at that position, testified that the reason he took on the responsibility to do it in this instance is because he had done it before. He had made one before for at least one machine and possibly two, and therefore he knew what he needed to make. It was suitable for that work environment, and he sketched one that was suitable for this new machine, and he gave it to their contractor, and the contractor built it. Doesn't the asbestos case at least raise enough questions about who should have known what and what duties were owed now to make this a jury case, not a summary judgment case? Truly not, Your Honor. And, again, I have to respectfully reinforce that it is a duty case. It's the court's duty. It's the court's job to recognize whether a legal duty exists. But if there are factual disputes that affect the determination on duty, who decides those factual disputes? I don't think we're dealing with factual disputes. Assuming there are some. If there were, that would be a jury question, but there are not factual disputes necessarily, Your Honor. There seems to be some disagreement over whether the LaRock's representative at the training was involved, to what extent. There seems to be some dispute over whether this external rack is necessary. Why shouldn't a jury decide those kinds of questions?  If there is any claim that during the procedures that were witnessed by the LaRock's people that there had been any reversing of the hand crank, nobody testified that during the parts that LaRock's witnessed, that the hand crank on this unique rack provided by Xerox, specced by Xerox, and built by Xerox, behaved in a way that should have alerted the LaRock's people, wait a minute, perhaps the crank that you elected to use on your unique rack may have a problem. You're emphasizing the you elect part and should, under the circumstances, where LaRock's puts the crank into the drawing and LaRock's is present, shouldn't LaRock's bear some responsibility? No, Your Honor. And to be clear, the crank itself is not specified in the drawing. The drawing is a very, very rough sketch that shows the A frame of the external rack, but it doesn't specifically spec the robustness of the hand crank. That was clearly the election of Xerox. Thank you. We have your argument. We hear the rebuttal. Just quickly, Your Honor, with respect to whether or not there was recognition on the part of LaRock's that something like this could happen, I believe that would be an issue for the jury to determine. Reasonably foreseeable. Reasonably foreseeable if they're already aware that the machine itself can be damaged. Is that a crank in the drawing? I can't quite tell if there is a crank in the drawing. It is. It looks like there is a handle. Yes. Yeah. And lastly, there was some indication by counsel that Mr. Malachowski, who actually sketched this thing out, had sketched out designs for other. There is no other machine at the Xerox plant at the time that had this powered release of the cloth. All of the other devices could be controlled directly by the crank, so there was no question about the cloth actually being pulled in on those other machines. Let me ask you this. Consistent with the drawing, could not the cranking have itself been done by an automated machine rather than a human being? That's what our expert said. It was Xerox's choice to use it by hand. But Xerox doesn't know what the problems are. Xerox doesn't know that this thing is going to internally develop this problem where the cloth gets pulled back. The expert is LaRock's. Xerox should have anticipated that there could be problems with a hand crank when they saw it. Exactly. Okay. All right.